FILED
2023 Jan-27  AM 11:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION**

| | | |
|---|---|---|
| KEITH ANTWON ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:20-cv-01542-KOB-NAD |
| | ) | |
| JEFFERSON DUNN, Commissioner, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION**

Plaintiff Keith Antwon Alexander filed a *pro se* complaint pursuant to 42 U.S.C. § 1983, alleging Eighth Amendment excessive force and supervisory liability claims in connection with an incident while he was incarcerated at the Donaldson Correctional Facility.[1] Doc. 1. Plaintiff Alexander names the following Defendants: Correctional Officer Roderick Gadson, Commissioner Jefferson Dunn, Associate Commissioner Grantt Culliver, Warden Christopher Gordy, and Warden Errol Pickens. Doc. 1 at 13–15.

On May 19, 2021 (and pursuant to 28 U.S.C. § 1915), the court dismissed all of Alexander's claims, except his Eighth Amendment excessive force and

---

[1] Plaintiff Alexander has been transferred several times since filing this action, but notified the court in January 2022 that he had returned to the Donaldson Correctional Facility. Doc. 19.

1

supervisory liability claims against Defendants Gadson, Dunn, Culliver, Gordy, and Pickens. Doc. 10. While that May 19, 2021 order also permitted Alexander to pursue claims against "two unknown segregation officers" (Doc. 10 at 2), Alexander then was instructed that, should he discover the identities of those two individuals, he would be required to amend his complaint to name them as defendants (Doc. 11 at 3–4 & n.2). Because Alexander did not discover those identities, and did not amend his complaint, the "two unknown segregation officers" never became proper parties to this action.[2]

Alexander alleges that Defendant Gadson violated his Eighth Amendment rights by using excessive force against him. Alexander alleges that Defendants Dunn, Culliver, Gordy, and Pickens are liable in their supervisory capacities because they were aware that Gadson had a pattern of using excessive force against prisoners, but took no steps to prevent his use of excessive force. Doc. 1 at 11–12. Alexander seeks money damages. Doc. 1 at 5.

Consistent with the usual practices of this court and 28 U.S.C. § 636(b)(1), this matter was referred to the undersigned for a preliminary report and recommendation. *See McCarthy v. Bronson*, 500 U.S. 136 (1991); N.D. Ala. Local

---

[2] Generally, there is no fictitious party practice in federal court, unless a plaintiff can specifically describe or identify the defendant. *See Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010); *New v. Sports & Recreation, Inc.*, 114 F.3d 1092, 1094 n.1 (11th Cir. 1997).

2

Rule 72.1.  For the reasons stated below, the court should grant Defendants' motion for summary judgment.

## BACKGROUND

### A.    Factual background

#### 1.    October 10, 2018 physical altercation between Alexander and correctional officers, including Defendant Gadson

Generally speaking, the material facts are undisputed.  In his sworn complaint, Alexander avers that on October 10, 2018, Defendant Correctional Officer Gadson and two other officers entered his cell in the Donaldson Correctional Facility's segregation unit and assaulted him.  Doc. 1 at 5, 11.  According to Alexander, Gadson repeatedly hit Alexander on his leg with his baton and fists, kicked Alexander in his head, and sprayed mace down Alexander's throat. Doc. 1 at 11.  In addition, the two unnamed officers swung batons at Alexander's head, torso, and legs.  Doc. 1 at 11.  Gadson and the two other officers then escorted Alexander to the infirmary.  Doc. 1 at 11.

A use of force report—which was submitted with a sworn affidavit from Defendant Warden Pickens—shows that Alexander told Gadson and other officers that he wanted to speak with non-party Sergeant Watts.  Doc. 25-1 at 4.  Gadson responded that, when the officers finished picking up meal trays, he would send for Watts.  Doc. 25-1 at 4.

But Alexander insisted on speaking to Watts, and—when Gadson attempted

3

to secure Alexander's cell door—Alexander placed his foot in the door to prevent it from closing.[3]  Doc. 25-1 at 4.

The use of force report indicates, and Gadson avers in a sworn affidavit, that—while Alexander was holding the door open with his foot—Gadson saw Alexander reach into his shorts and pull out an inmate-made knife.[4]  Doc. 25-1 at 4; Doc. 25-2. Alexander then extended the knife toward the officers through the gap in his cell door caused by his foot.  Doc. 25-1 at 4.

Gadson yelled "knife" while attempting to secure the cell door.  Doc. 25-1 at 6.  Another officer "secured" Alexander's arm while simultaneously delivering palm heel strikes to Alexander's face.  Doc. 25-1 at 6.

When Alexander refused to drop the weapon, Gadson sprayed Sabre Red (mace) in Alexander's face.  Doc. 25-1 at 4; Doc. 25-2.  Because Alexander still did not drop the weapon, Gadson used his baton to strike Alexander's legs, until he released the knife.  Doc. 25-1 at 4; Doc. 25-2.  The officers then secured the weapon, subdued Alexander, handcuffed him, and took him to the infirmary where he received a medical examination.  Doc. 1 at 11; Doc. 25-1 at 2, 4, 6, 8.

---

[3] In his sworn affidavit, Defendant Warden Gordy explains that the cell doors in Donaldson's Behavior Modification Unit do not have tray hole slots, so officers must open the cell doors to retrieve meal trays.  Doc. 25-9 at 1.

[4] The knife was described as a box cutter, approximately four inches long with a metal blade and a handle made from melted plastic.  Doc. 25-1 at 7.

In the use of force report, non-party Captain Jeffery Baldwin found Gadson's use of force justified.[5]  Doc. 25-1 at 4.

In this case (and with respect to the relevant incident), Alexander has not addressed—much less disputed—the facts that he had a knife and disobeyed orders to drop it.

While Alexander alleges that medical staff failed to provide him adequate medical treatment (Doc. 1 at 11), a body chart performed at the time indicates that Alexander had small lacerations to his left eyelid and his right eye orbital, a superficial puncture wound to his right arm, and chemical spray to his face.[6]  Doc. 25-1 at 5.  Contemporaneous photographs show Alexander's facial injuries, but also show him standing on both legs equally with no clear sign of injury to either leg. Doc. 25-3.

According to Alexander, on October 23, 2018, he saw a dentist for a tooth extraction.[7]  Doc. 1 at 11.  The dentist noticed that Alexander's leg was injured and

---

[5] Alexander refused to complete a written statement about this incident.  Doc. 25-1 at 4, 9.

[6] Alexander did not name as defendants any medical providers, and did not allege any claim related to his medical care.  In any event, the court already has dismissed all of Alexander's claims, except his Eighth Amendment excessive force and supervisory liability claims against Defendants Gadson, Dunn, Culliver, Gordy, and Pickens.  Doc. 10.

[7] Medical records show that a dentist examined Alexander on September 25, 2018 (that is, before the relevant incident in October 2018).  Doc. 25-5 at 29.  Alexander was seen again for a tooth extraction on October 27, 2018 (Doc. 25-6 at 3), four days

referred him to a nurse. Doc. 1 at 11. A medical record created on October 23, 2018, indicates that Alexander stated that he was beaten with a stick on his left shin and ankle on October 10, 2018. Doc. 25-5 at 1. He experienced "no pain at time of injury, but a few hours later began to swell up and the pain began." Doc. 25-5 at 1. Alexander stated that he had trouble walking, could not move his ankle, and experienced pain at a level of 9 out of 10. Doc. 1 at 11; Doc. 25-5 at 1. Alexander was transferred to UAB Hospital's emergency room. Doc. 25-5 at 1. Hospital staff diagnosed Alexander with a fractured fibula and treated him. Doc. 1 at 11. On October 28, 2018, Alexander had a follow up visit with an orthopedist. Doc. 25-4 at 35. No other medical records or requests for medical care relevant to this injury appear in the record.

### 2.   Alleged pattern of Gadson's use of excessive force

Alexander avers that "Gadson has demonstrated a pattern of using excessive force against prisoners" since 2011. Doc. 1 at 11–12. Alexander avers that Gadson used excessive force against prisoners as follows: in February 2011 ("allegedly"), and against the same prisoner a few weeks later, in June 2012 ("allegedly"), in April 2013 ("reportedly"), in December 2015, five times against one prisoner in August 2016, in December 2017, and in October 2019 (after the relevant incident in this

---

after Alexander's referral to UAB Hospital's emergency room. A follow-up dental record is dated November 6, 2018. Doc. 25-6 at 6.

case). Doc. 1 at 11–12. Alexander's complaint includes minimal factual allegations about these purported assaults. Doc. 1 at 11–12.

Alexander also avers that Defendant Commissioner Dunn, Defendant Associate Commissioner Culliver, Defendant Warden Gordy, and Defendant Warden Pickens were "aware of and responsible for addressing" Gadson's "pattern" of using excessive force; but Defendants failed hold Gadson accountable, failed to discipline him, failed to "implement[] corrective action," and continued to employ him. Doc. 1 at 12. Alexander avers further that Defendants "are aware that their management practices have created a culture of violence throughout Alabama's correctional facilities," noting Department of Justice (DOJ) reports and a DOJ investigation, as well as other incidents of purported violence and abuse at other prisons that appear to be unconnected to Gadson. Doc. 1 at 12.

In his sworn affidavit, Dunn avers that he had no personal knowledge of the allegations in Alexander's complaint, and that he does not "condone any level of inappropriate violence" in any Alabama Department of Corrections' facility. Doc. 25-7.

Defendant Culliver avers in his sworn affidavit that he never has been deliberately indifferent to incidents at Donaldson, and that he did not handle day-to-day operations there. Doc. 25-8 at 1. Culliver also avers that he had no knowledge of Gadson's history of using excessive force on inmates. Doc. 25-8 at 2.

In his sworn affidavit, Defendant Pickens avers that there was no pattern of Gadson using excessive force while Pickens was a warden at Donaldson. Doc. 25-1 at 2. And, Defendant Gordy likewise avers in his sworn affidavit that he had no knowledge of Gadson engaging in any pattern of excessive force. Doc. 25-9 at 2.

**B.   Procedural background**

As noted above, on May 19, 2021, the court dismissed all of Alexander's claims, except his Eighth Amendment excessive force and supervisory liability claims against Defendants Gadson, Dunn, Culliver, Gordy, and Pickens, pursuant to 28 U.S.C. § 1915. Doc. 10.

In response to an order for special report (Doc. 11),[8] Defendants Gadson, Dunn, Culliver, Gordy, and Pickens filed a special report, which they supported with affidavits and exhibits. Doc. 25.

On May 4, 2022, the parties were notified that the court would construe the special report as a summary judgment motion, and Alexander was notified that he had the right to respond to the summary judgment motion by filing affidavits or other evidence. Doc. 26. Alexander also was advised of the consequences of any failure to respond or comply with Federal Rule of Civil Procedure 56. Doc. 26; *see Griffith v. Wainwright*, 772 F.2d 822, 825 (11th Cir. 1985).

But Alexander did not file any response.

---

[8] This case was reassigned to the undersigned on August 31, 2021.

### C.    Legal background

### 1.    Excessive force under the Eighth Amendment

Under the Eighth Amendment,[9] "the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (quoting *Ingraham v. Wright*, 430 U.S. 651, 670 (1977)) (quotation marks omitted).  "What is necessary to establish an 'unnecessary and wanton infliction of pain' . . . varies according to the nature of the alleged constitutional violation." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992) (quoting *Whitley*, 475 U.S. at 320).

In the context of a custodial excessive force claim, "corrections officers must balance the need 'to maintain or restore discipline' through force against the risk of injury to inmates." *Id.* at 6 (citations omitted).  And, "officials confronted with a prison disturbance must balance the threat unrest poses to inmates, prison workers, administrators, and visitors against the harm inmates may suffer if guards use force." *Id.*

For instance, the use of force generally is justified where it is "necessary to restore order." *See, e.g.*, *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990);

---

[9] *See, e.g.*, *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 764 & n.12 (2010); *Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) (stating that, with a few exceptions, the United States Supreme Court "has held that the Fourteenth Amendment's Due Process Clause incorporates the protections contained in the Bill of Rights, rendering them applicable to the States").

*accord Pearson v. Taylor*, 665 F. App'x 858, 864 (11th Cir. 2016) ("In general, prison officials are authorized to use force when a prisoner repeatedly fails to obey an order . . . Officers are not required to convince every prisoner that their orders are reasonable . . . before resorting to force." (citations omitted)).

Regardless, on a custodial excessive force claim, "whenever prison officials stand accused of using excessive physical force," the "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 6–7; *see also Sears*, 922 F.3d at 1205 (similar).

The United States Supreme Court has articulated factors for "determining whether the use of force" in the custodial context "was wanton and unnecessary." *Hudson*, 503 U.S. at 7; *see also Whitley*, 475 U.S. at 319 ("the unnecessary and wanton infliction of pain . . . constitutes cruel and unusual punishment").

Those factors (commonly referred to as the *Whitley* factors) include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321).

Also, "the extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular

10

situation, 'or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur.'" *Id.* (quoting *Whitley*, 475 U.S. at 321). "The extent of injury may also provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). So, "[t]he absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson*, 503 U.S. at 7.

In addition, the U.S. Supreme Court has instructed that "courts considering a prisoner's claim must ask both if 'the officials act[ed] with a sufficiently culpable state of mind' and if the *alleged wrongdoing* was objectively 'harmful enough' to establish a constitutional violation." *Id.* at 8 (citation and quotation marks omitted; alteration in original; emphasis added). In this regard, the Supreme Court has referred to a "subjective" and "objective" component of a custodial excessive force claim. *Id.* ("the subjective aspect of an Eighth Amendment claim . . . can be distinguished from the objective facet of the same claim").

For the subjective component, analyzed under the *Whitley* factors, a court should be mindful of the prison officials' point of view based on the facts known at the time, and should "give a wide range of deference to prison officials acting to preserve discipline and security." *Sears*, 922 F.3d at 1205 (citing *Cockrell v. Sparks*, 510 F.3d 1307, 1311 (11th Cir. 2007)). A court should recognize that "corrections officials must make their decisions in haste, under pressure, and frequently without

11

the luxury of a second chance" (*Hudson*, 503 U.S. at 6 (citations omitted)), but such deference "does not insulate from review actions taken in bad faith or for no legitimate purpose" (*Whitley*, 475 U.S. at 322).

For the objective component, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 9 (citation omitted); *see Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.").

"The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9 (citations and quotation marks omitted); *see Wilkins*, 559 U.S. at 38 ("An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." (citations and quotation marks omitted)).

But, regardless "whether or not significant injury is evident," "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Hudson*, 503 U.S. at 9 (citing *Whitley*, 475 U.S. at 327). "Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary

quantity of injury." *Id.*

As the Supreme Court has explained, "[i]njury and force . . . are only imperfectly correlated, and it is the latter that ultimately counts." *Wilkins*, 559 U.S. at 38. "An inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury." *Id.*

### 2. Qualified immunity

Qualified immunity provides "complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quotation marks omitted). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Saunders v. Duke*, 766 F.3d 1262, 1266 (11th Cir. 2014) (quoting *Lane v. Franks*, 573 U.S. 228, 243 (2014)). In order to receive the protection of qualified immunity, a government official first must prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).

To overcome qualified immunity, a plaintiff then must show (1) that the officials violated a constitutional right, and (2) that the right was clearly established

13

at the time of the alleged violation. *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). A court may address these two prongs "in either order." *Waldron v. Spicher*, 954 F.3d 1297, 1304 (11th Cir. 2020).

For a right to be clearly established, a plaintiff can either identify case precedents with materially similar facts or show that the violation was so obvious that every reasonable officer would know that his actions were unconstitutional. *Corbitt v. Vickers*, 929 F.3d 1304, 1311–12 (11th Cir. 2019). In other words, the law must give the officer "fair warning" that his conduct is unconstitutional. *Piazza v. Jefferson Cty., Ala.*, 923 F.3d 947, 955 (11th Cir. 2019) (citations omitted). In analyzing qualified immunity, courts focus not only on the state of the law, but on the factual information the defendant possessed. *See Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (stating that the qualified immunity analysis "will often require examination of the information possessed by" the defendant officials).

### 3. Supervisory liability

"[I]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Keith v. DeKalb Cty., Ga.*, 749 F.3d 1034, 1047 (11th Cir. 2014) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)). Instead, liability may attach only if the supervisor participated directly in the unconstitutional conduct or a causal connection exists between the

14

supervisor's actions and the alleged constitutional violation. *Harrison v. Culliver*, 746 F.3d 1288, 1298 (11th Cir. 2014); *see Henley v. Payne*, 945 F.3d 1320, 1331 (11th Cir. 2019).

A causal connection may be established where (1) a "'history of widespread abuse' puts the responsible supervisor on notice of the need to correct the alleged deprivation," and the supervisor fails to do so, (2) a "supervisor's custom or policy results in deliberate indifference to constitutional rights," or (3) "facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Valdes v. Crosby*, 450 F.3d 1231, 1237 (11th Cir. 2006) (quoting *Cottone*, 326 F.3d at 1360).

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond the allegations to offer specific facts that create a genuine dispute for trial. *Celotex*, 477 U.S. at

15

324–25. The court's job is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and draw all reasonable inferences in favor of the nonmovant. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

In addition, on a defendant's summary judgment motion, the court must consider any "specific facts" that a *pro se* plaintiff pleaded in his sworn complaint. *See Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1098 (11th Cir. 2014) (citing *Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir. 1986)). The court liberally construes a *pro se* pleading. *See, e.g.*, *Jones v. Florida Parole Comm'n*, 787 F.3d 1105, 1107 (11th Cir. 2015) (the court should hold a *pro se* pleading to "a less stringent standard than a pleading drafted by an attorney").

Furthermore, the practical reality that a plaintiff's "evidence consists mainly of his own testimony in his verified complaint, sworn response, and sworn affidavit does not preclude a finding that a genuine dispute of material fact exists." *Sears v. Roberts*, 922 F.3d 1199, 1208 (11th Cir. 2019). And, "[e]ven if his sworn statements turn out to be exaggerations or false, they are enough to raise a genuine issue of material fact" for trial. *Id.* at 1209. On a summary judgment motion, a court cannot

16

make credibility determinations. *Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006).

## DISCUSSION

The court should grant Defendants' summary judgment motion on all of Plaintiff Alexander's remaining claims—i.e., his Eighth Amendment excessive force claim against Defendant Gadson, supervisory liability claims against Defendants Dunn, Culliver, Gordy, and Pickens, and official capacity claims.

## I.    The court should grant summary judgment on Alexander's Eighth Amendment excessive force claim against Defendant Gadson.

The court should grant Defendants' summary judgment motion on Alexander's Eighth Amendment excessive force claim against Defendant Gadson. As explained above, Alexander avers that Gadson used excessive force against him by entering his cell, hitting him repeatedly in his leg with his baton and fists, kicking him in his head, and spraying him with mace in his face. Doc. 1 at 11–12.

Construing the record evidence and all reasonable inferences in Alexander's favor, no jury reasonably could find that Gadson violated Alexander's Eighth Amendment right against excessive force. *Marbury*, 936 F.3d at 1232. There can be no genuine dispute as to any material fact because it is undisputed that Alexander prevented Gadson from closing his cell door with his foot, that Alexander pulled out a knife and extended the knife toward Gadson, and that Alexander disobeyed orders to drop the knife. *See* Doc. 1 at 11–12; Doc. 25-1; Doc. 25-2. It also is undisputed

17

that Gadson used force against Alexander, but only after Alexander held open the cell door, pulled and extended out the knife, and refused to drop the knife. *See* Doc. 1 at 11–12; Doc. 25-1; Doc. 25-2. Further, it is undisputed that Gadson stopped using force once officers had secured Alexander's knife, subdued Alexander, and handcuffed him. Doc. 1 at 11; Doc. 25-1 at 2, 4, 6, 8.

Both Eleventh Circuit caselaw and the *Whitley* factors support summary judgment for Gadson because no reasonable jury could find that Gadson applied force against Alexander "maliciously and sadistically to cause harm," rather than "in a good-faith effort to maintain or restore discipline." *Hudson*, 503 U.S. at 6–7.

Correctional officers can use force against a prisoner when necessary to restore order—for instance, when a prisoner refuses to comply with specific instructions. *See Bennett*, 898 F.2d at 1533; *Pearson*, 665 F. App'x at 864. "Prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) (overruled on other grounds as recognized by *Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010)). "And prison guards do not have the luxury or obligation to convince every inmate that their orders are reasonable and well-thought out" before using force. *Id.*; *see also Soto v. Dickey*, 744 F.2d 1260, 1267 (7th Cir. 1984) (explaining that prison officials cannot avoid using force and simply leave a prisoner alone after the prisoner fails to obey a

18

particular order, as "experience and common sense establish that a prison cannot be operated in such a way").

With respect to the force that Gadson used in this case, the Eleventh Circuit has held that a "short burst of pepper spray is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders." *Pearson*, 665 F. App'x at 864 (quoting *Danley*, 540 F.3d at 1307–08). And the use of batons also can be justified where a prisoner threatens correctional officers with a knife. *See, e.g.*, *Burke v. Jackson*, No. 4:19-CV-124-AKK-GMB, 2022 WL 2951458, at *4 (N.D. Ala. June 28, 2022), *report and recommendation adopted*, 2022 WL 2920401 (N.D. Ala. July 25, 2022) (finding that the use of batons was not excessive force where an unrestrained prisoner had possessed a knife).

Furthermore, there is no evidence that Gadson used any force after Alexander dropped the knife and had been subdued. *See* Doc. 1 at 11; Doc. 25-1 at 2, 4, 6, 8; *see, e.g.*, *Nasseri v. City of Athens*, 373 F. App'x 15, 19 (11th Cir. 2010) ("It is excessive force for a jailer to continue using force against a prisoner who already has been subdued.").

A factfinder must "give a wide range of deference to prison officials acting to preserve discipline and security, including when considering decisions made at the scene of a disturbance." *Sears*, 922 F.3d at 1205. And (generally), "[a] prisoner may avoid summary judgment, 'only if the evidence viewed in the light most

19

favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain.'" *Stallworth v. Tyson*, 578 F. App'x 948, 953 (11th Cir. 2014) (quoting *Brown v. Smith*, 813 F.2d at 1187, 1188 (11th Cir. 1987)); *see, e.g.*, *Wilkins*, 559 U.S. at 37; *Crocker v. Beatty*, 995 F.3d 1232, 1248 (11th Cir. 2021) (If "an officer applied force 'maliciously and sadistically' . . . then there was excessive force.  If not, then there wasn't.").  On the record evidence, there is no basis from which a jury reasonably could infer that Gadson applied force against Alexander with the required, "sufficiently culpable state of mind."  *Hudson*, 503 U.S. at 8 (quotation marks omitted).

The *Whitley* factors confirm that no reasonable jury could find a constitutional violation.  *See Hudson*, 503 U.S. at 7.  Given Alexander's noncompliance and knife, Gadson perceived a threat to safety, and there was a need for Gadson to apply force. *See id.*  Given that threat and that need, and the undisputed fact that Gadson did not continue to use force after Alexander dropped the knife and had been subdued, the only reasonable inferences can be that the amount of force applied was reasonable, and that Gadson reasonably tempered his forceful response. *See id.*  According to Gadson, he and other officers used the force necessary to obtain the weapon from Alexander, and to secure Alexander in handcuffs.  Doc. 25-1 at 4; Doc. 25-2. Gadson's account of the incident reflects increasing force in response to Alexander's

20

continued refusals to comply with instructions while holding a weapon.  And Alexander does not dispute those averments.  As a result, the unrefuted evidence reflects an escalating response as Alexander (1) refused to remove his foot from the cell door, (2) produced a weapon, (3) threatened officers with that weapon, and (4) refused to drop the weapon.  Another officer applied palm heel strikes to Alexander, and when that did not produce his compliance Gadson sprayed him with Sabre Red.  Doc. 25-1 at 4.  When Alexander still refused to drop his weapon, Gadson used his baton on Alexander's leg.  Doc. 25-1 at 4.

Moreover, the extent of Alexander's injuries—including a broken lower leg, apparently from the baton strikes when he persisted in refusing to drop the knife[10]— is not inconsistent with the reasonable use of force on the facts of this case.  *See Hudson*, 503 U.S. at 7.

Accordingly, on the record evidence, Alexander cannot create a jury question regarding whether Gadson violated his constitutional rights.  Further, because no reasonable jury could find a constitutional violation, Gadson would be entitled to qualified immunity.[11]  *See Marbury*, 936 F.3d at 1232.

---

[10] Defendants dispute Alexander's allegation that his leg was broken during the relevant incident.  Doc. 25 at 7 n.1.  Defendants point out that there is no record of any injury to Alexander's leg until 13 days after the incident, and that the contemporaneous photographs do not show any injury to Alexander's lower leg.  Doc. 25 at 7 & n.1.  But, at this stage, the court must construe the evidence and sworn allegations in Alexander's favor.  *See* Doc. 1 at 11.

[11] If there were a genuine dispute of material fact on the question whether Gadson

## II. The court should grant summary judgment on Alexander's supervisory liability claims against Defendants Dunn, Culliver, Gordy, and Pickens.

The court should grant Defendants' summary judgment motion on Alexander's supervisory liability claims against Defendants Dunn, Culliver, Gordy, and Pickens. As explained above, Alexander alleges that Defendants knew that Gadson had exhibited a pattern of using excessive force against prisoners, and that

---

had used excessive force in violation of the Eighth Amendment, Eleventh Circuit precedent would dictate that the qualified immunity defense "is not available." *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002). But multiple district courts in this circuit—including in this district—have noted "significant tension between *Skrtich*'s bright-line rule and Supreme Court precedent on qualified immunity, which may call for a more fact-specific analysis of whether the particular type and extent of force at issue has been 'clearly established' as unconstitutional." *Wilhite v. Parker*, No. 7:20-CV-00847-KOB, 2022 WL 3718502, at *3 (N.D. Ala. Aug. 29, 2022); *see also Stalley v. Cumbie*, 586 F. Supp. 3d 1211, 1227 n.8 (M.D. Fla. 2022). Here, if the court could engage in a factually specific analysis about whether Alexander's Eighth Amendment right was clearly established, Gadson did not have "fair warning" that the force he applied against Alexander would be unconstitutional. *See Piazza*, 923 F.3d at 955; *Anderson*, 483 U.S. at 641; *Marbury*, 936 F.3d at 1232. Again, the undisputed facts show that Alexander was holding open his cell door, extending a knife, and refusing to comply with orders to drop the knife; consequently, Gadson used force to secure the knife and subdue Alexander, and then stopped after the officers had confiscated the knife and handcuffed Alexander. *See* Doc. 1 at 11; Doc. 25-1 at 4; Doc. 25-2. Given those facts and the information that Gadson possessed at the time of the incident, Alexander's Eighth Amendment right was not clearly established at the time of the alleged constitutional violation. *See Anderson*, 483 U.S. at 641; *see also Miles v. Jackson*, 757 F. App'x 828, 830 (11th Cir. 2018) (holding that there was no excessive force where the inmate failed to comply with orders and evaded attempts to compel compliance); *Thomas v. Melton*, No. 2:19-CV-966-LCB-GMB, 2021 WL 641549, at *5 (N.D. Ala. Jan. 20, 2021), *report and recommendation adopted*, 2021 WL 633316 (N.D. Ala. Feb. 18, 2021) (finding that there was no excessive force where the inmate stabbed a correctional officer).

22

Defendants failed to stop his use of excessive force.  Doc. 1 at 11–12.

As an initial matter, "there can be no supervisory liability" where there is "no underlying constitutional violation."  *Paez v. Mulvey*, 915 F.3d 1276, 1291 (11th Cir. 2019) (quoting *Gish v. Thomas*, 516 F.3d 952, 955 (11th Cir. 2008)).  As discussed above (*see* supra Part I), there is no genuine dispute of material fact on the question whether Gadson violated Alexander's Eighth Amendment rights.  Consequently, there can be no supervisory liability against Defendants Dunn, Culliver, Gordy, and Pickens based on Gadson's alleged conduct.

In addition (as explained above), Alexander must show that Defendants participated directly in the alleged unconstitutional conduct, or that there was a causal connection between Defendants' actions and the alleged constitutional violation.  *See Harrison*, 746 F.3d at 1298.  There is no evidence, and Alexander does not aver, that any of Defendants participated directly in the alleged unconstitutional conduct.  Nor is there any evidence or allegation that any of Defendants' custom or policy resulted in deliberate indifference to constitutional rights, or that Defendants directed Gadson to act unlawfully.  *See Valdes*, 450 F.3d at 1237.

Rather, Alexander alleges that Gadson had a history of purported abuse, which put Defendants on notice, and that Defendants failed to stop him from using excessive force.  *See Valdes*, 450 F.3d at 1237; Doc. 1 at 11–12.

23

But, in this regard, the Eleventh Circuit has clarified that the required, "widespread abuse" must be "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences," in order to sufficiently notify a supervising official and to support a causal connection between the defendant official and the alleged constitutional violation. *West v. Tillman*, 496 F.3d 1321, 1329 (11th Cir. 2007) (citations and quotation marks omitted).

Here, Alexander's complaint lists 8 alleged incidents of Gadson's violence over more than 8 years (although 1 such incident does allegedly involve 5 separate beatings of the same prisoner over 3 days). Doc. 1 at 11–12. But Alexander has provided no evidence in support of these allegations, no factual allegations regarding any basis for his knowledge of any of these alleged incidents, and no factual allegations regarding the context or circumstances of the alleged incidents. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007) (factual allegations in a complaint must "raise a right to relief above the speculative level," and cannot be comprised of "mere conclusory statements"). Alexander does not suggest that he personally observed any of these incidents. Instead, Alexander identifies 3 of these incidents as "allegedly" or "reportedly" having occurred (Doc. 1 at 11–12), and another of these incidents allegedly occurred after the relevant incident in this case.

Nor has Alexander provided any factual allegation that Defendants knew—or even should have known—about any of these alleged incidents involving Gadson.

24

Rather, Alexander alleges a supposed general awareness that "[e]xcessive use of force by ADOC [Alabama Department of Corrections] officers and specifically Officer Gadson was a pattern." Doc. 1 at 12.

Thus, on the record evidence (and construing all sworn allegations and reasonable inferences in Alexander's favor), no reasonable jury could find that these alleged incidents constitute the "widespread abuse" that is "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences," or that Defendants were put on notice of Gadson's alleged abuse, as is required to support a supervisory liability claim. *See West*, 496 F.3d at 1329.[12]

### III. The court should grant summary judgment on Alexander's official capacity claims against Defendants.

The court should grant Defendants' summary judgment motion on Alexander's official capacity claims. The Eleventh Amendment bars suits against a

---

[12] Alexander also alleges a "culture of violence throughout Alabama's correctional facilities," and alleges that the DOJ has investigated and issued reports, such that "Defendants know" about officer violence at the Ventress Correctional Facility and abuse at the Julia Tutwiler Prison. Doc. 11 at 12. But Alexander does not allege any factual connection between those generalized allegations of violence and abuse (and/or the DOJ investigation and reports) and the relevant incident in this case. Those generalized allegations cannot create a genuine dispute of material fact on the question whether Defendants were put on notice of Gadson's alleged pattern of excessive force. *See, e.g.*, *Ivory v. Warden, Governor of Ala.*, 600 F. App'x 670, 678 (11th Cir. 2015) (stating in a deliberate indifference context that, "[a]lthough the defendants may have known of similar conditions in Alabama prisons generally as a result of other litigation or newspaper articles, there is nothing in the record to show that [the defendants] knew of the specific conditions at [issue] challenged by [the plaintiff]").

state or one of its agencies or departments, unless the state has waived its Eleventh Amendment immunity or Congress has abrogated that immunity. *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1524–25 (11th Cir. 1990). The State of Alabama has not waived its Eleventh Amendment immunity, and Congress has not abrogated Eleventh Amendment immunity for claims under § 1983. *Id.* at 1525.

Furthermore, under the Eleventh Amendment, state officials sued for damages in their official capacities are immune from suit in federal court. *Jackson v. Georgia Dep't of Transp.*, 16 F.3d 1573, 1575 (11th Cir. 1994). Official capacity lawsuits are, "in all respects other than name, . . . treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

Because the Alabama Department of Corrections (ADOC) is an agency of the State of Alabama, and because each of Defendants was either an ADOC employee or agent or acting as a state agent, Eleventh Amendment immunity bars Alexander's official capacity claims. *See, e.g.*, *Buford v. Alabama Dep't of Corr.*, No. CV 1:20-00006-WS-N, 2020 WL 1901070, at *1 (S.D. Ala. Jan. 9, 2020), *report and recommendation adopted*, 2020 WL 587647 (S.D. Ala. Feb. 6, 2020) (finding that official capacity claims against ADOC employees/agents are barred by the Eleventh Amendment).

## RECOMMENDATION

For the reasons stated above, the undersigned **RECOMMENDS** that the court

26

**GRANT** Defendants' summary judgment motion (Doc. 25), and **DISMISS WITH PREJUDICE** all of Plaintiff Alexander's remaining claims—i.e., his Eighth Amendment excessive force and supervisory liability claims against Defendants Gadson, Dunn, Culliver, Gordy, and Pickens.

### NOTICE OF RIGHT TO OBJECT

Any party may file specific written objections to this report and recommendation. Any objections must be filed with the Clerk of Court within **14 days**. The objecting party must identify every objectionable finding of fact or recommendation and state the specific basis for every objection. The objecting party also must identify every claim in the complaint that the report and recommendation has not addressed. Objections should not contain new allegations, present additional evidence, or repeat legal arguments.

A party who fails to object to factual or legal conclusions in the Magistrate Judge's report and recommendation waives the right to challenge on appeal those same conclusions adopted in the District Judge's order. Without a proper objection, however, the court on appeal may review the unobjected-to factual and legal conclusions for plain error if necessary in the interests of justice. 11th Cir. R. 3-1.

After receiving the objections, a District Judge will conduct a *de novo* review of the relevant portions of the report and recommendation and may accept, reject, or modify, in whole or in part, the Magistrate Judge's findings of fact and

recommendations. The District Judge also may refer this action back to the Magistrate Judge with instructions for further proceedings.

A party may not appeal the Magistrate Judge's report and recommendation directly to the United States Court of Appeals for the Eleventh Circuit. A party may appeal only from a final judgment entered by a District Judge.

**DONE** this January 27, 2023.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE

28